# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JEANINE KIRK,

                        Plaintiff,

-vs-                                                Case No.  6:04-cv-883-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.
_____

# ORDER

This matter came before the Court for consideration without oral argument on the

complaint filed by Jeannine Kirk[1] seeking review of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying her claim for social security disability

benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified copy of the

transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 4.  The

parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant

to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local

Rule 6.05 for adjudication.  Doc. Nos. 6, 8.

## I.    PROCEDURAL BACKGROUND.

In October 2001, Kirk applied for disability benefits under the Federal Old Age, Survivors

and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq*., alleging a disability onset

_____

[1] While the caption of the complaint refers to "Jeanine Kirk," the transcript consistently spells
Ms. Kirk's first name as "Jeannine."  I will use the later spelling because it is consistent with the
record as a whole.

date of September 4, 2001.  TR. 47-49.  The SSA denied Kirk's application both initially and on

reconsideration.  TR. 32-33, 35-36.  Then, Kirk made a timely request for a hearing.  TR. 31.

An Administrative Law Judge ("ALJ") held a hearing on July 29, 2003.  TR. 180.  Kirk,

who was accompanied by her attorney, testified at the hearing.  TR. 180-211.  A vocational expert

also testified regarding the types of jobs Kirk could perform and the existence of such jobs in the

economy.  TR. 211-16.

The ALJ found that Kirk had not engaged in substantial gainful activity since September 4,

2001, the alleged onset date of her disability.  TR. 21.  The ALJ concluded that the medical

evidence showed Kirk had the medically determinable impairments of degenerative disc disease of

the cervical and lumbosacral regions of the spine and left shoulder rotator cuff syndrome.  TR. 17.

The ALJ found that these impairments or combination of impairments were severe, but that they

did not meet or equal listed impairments in the SSA regulations.  TR. 17, 21.  The ALJ concluded

that Kirk's alleged mental impairments were not severe because they resulted in only mild

functional limitations.  TR. 17.

The ALJ found that Kirk had the residual functional capacity ("RFC")[2] to walk, stand, or

sit for up to six hours in an eight-hour workday, frequently lift or carry up to ten pounds, and

occasionally lift or carry up to ten pounds.  TR. 19.  She could occasionally climb, stoop, kneel,

---

[2] Residual functional capacity ("RFC") "is what an individual can still do despite his or her limitations."  Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474-01 (1996).  It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  *Id*.  RFC assesses the individual's ability "to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id*.  RFC does not represent "the least an individual can do despite his or her limitations or restrictions, but the most."  *Id*.

crouch and crawl but frequently balance.  She could only occasionally use and perform overhead

reaching with her left arm due to her rotator cuff injury.  She should avoid being around hazards

such as heights.  TR.  19.

In reaching this conclusion, the ALJ gave considerable weight to the opinions of reviewing

physicians, finding that those opinions were grounded in the evidence.  The ALJ also considered

the opinion of Dr. Lower, but she found it to be "somewhat extreme and inconsistent with the

objective medical evidence."  TR.  18.  With respect to Kirk's testimony about the limitations

arising from her impairments, the ALJ wrote as follows: "Overall, I find the claimant's testimony

and subjective statements regarding her pain and limitations credible to the extent of establishing

that she has a combination of severe impairments, but not fully credible to the extent of

establishing that these impairments are so severe as to preclude her from performing substantial

gainful activity as required under Social Security rules and regulations."  TR. 18

The ALJ found that Kirk could not return to her past relevant work.  TR. 20.  Relying on

the testimony of the VE, the ALJ concluded that Kirk could perform work as a non-emergency

dispatcher and a telephone salesperson, many of which jobs were available in both the local, state,

and national economies.  TR. 20.

Kirk requested review of the ALJ's decision.  TR. 7.  On April 7, 2004, the Appeals

Council found no basis for changing the ALJ's decision.  TR. 4-6.  Kirk timely sought review of

this decision by the United States District Court. Doc. No. 1.

## II.  JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Kirk's application for disability benefits under OASDI.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g).

## III.  STATEMENT OF FACTS.

A.  *Kirk's Testimony.*

Kirk was born on December 25, 1963.  TR. 185.  She holds an Associate's Degree in business, and spent four years in college.  TR. 187.

Kirk has worked as a loan officer for various mortgage companies.  TR. 187-88.  She also worked as a maid, a baker, a cake decorator, and as an EKG technician at a hospital.  TR. 188-89. She also reported that she worked as a waitress, cashier, stockperson, salesperson, movie theater concession supervisor, and cook.  TR. 63.

Kirk had pain in her neck, back and arm when she tried to lift something heavy, push, pull, and anytime she made sudden movements with her arms or neck. TR. 191, 200.  Her left hand always felt numb, and she complained of lack of strength in her left arm.  TR. 60, 197.  She had a constant ache in her neck radiating through her shoulder and down her left arm.  TR. 197.  Her doctors had prescribed hydrocodone[3] and oxycontin,[4] which helped relieve her pain, but the side effects from these medications made her sleepy, constipated, forgetful and lacking patience.  TR. 191-92, 196-97.  When the medication "starts wearing out," she also had difficulty concentrating.

---

[3] Hydrocodone is a narcotic pain relief medication often sold under the trade name Vicodin. DRUGS.COM, *at* http://www.drugs.com/hydrocodone.html (last visited Aug. 31, 2005) (hereinafter "Drugs.com").

[4] Oxycontin is a narcotic pain relief medication based on the same active ingredients as hydrocodone. Drugs.com *at* http://www.drugs.com/oxycontin.html (last visited Aug. 31, 2005).

TR. 202.  She had undergone epidural treatment three times, which did not work.  TR. 193-94.

With medication, she opined that her pain was a constant 5 or 6 on a scale of 1 to 10, with 10

being the most severe pain.  Without medication, her pain was "off the scale."  TR. 198.  She had

good days when the medication controlled her pain, and bad days when it did not do so.  TR. 203.

She had not had insurance since April 2003.  TR. 192, 206.

Kirk also had a heel spur in her left foot, which one of her doctors treated with a splint and

physical therapy.  TR. 198.  She apparently aggravated her foot injury in approximately 2001. by

climbing a ladder while painting a house.  TR.  198, 204.  Her left heel became painful if she

walked too much, and it hurt her once when she tried to use a stair stepper at a gym in September

2002.  TR. 199, 204.[5]

Kirk opined that she could walk half of a mile or a quarter of a mile before having to stop

due to discomfort.  TR. 199.  She could stand for "maybe an hour" before having to move to avoid

discomfort.  TR. 199.  A loaf of bread or a carton of eggs were examples of the amount of weight

Kirk could lift with her left arm.  TR. 199.  A gallon of milk was an example of what she could lift

with her right arm.  TR. 200.  Kirk had no problem sitting, but if she sat for a long time, it was

painful to stand.  TR. 200.  She had difficulty combing her hair and performing household chores

that required her to lift or reach.  TR. 56.

On a typical day, Kirk would take her son to the library, which was across the street from

her house.  TR. 195.  She would help with the cooking and laundry, and she would go to the

grocery store to purchase something.  TR. 195.  Kirk could generally take care of her hygiene,

---

[5] Kirk testified that she tried a variety of exercise machines at the gym, but each caused pain.  As a result, she quit going to the gym.  TR. 205.

though her husband would have to help her if she had too much pain.  TR. 195.  She could cook

with some assistance and adjustments for her pain.  TR. 195.  Her doctor instructed her not to

drive because of her medications, but sometimes she drove her daughter to school.  TR. 195.  In

November 2001, Kirk wrote that she was active in church, clubs and other social groups, including

volunteering at her daughter's school and being a girl scout leader.  TR. 60.  In 2002, she joined a

gym in order to exercise to lose weight, but, due to her heel pain and arm pain, she could not use

any of the gym's machines.  TR. 204.

       B.    *Vocational Expert Testimony.*

       The ALJ asked the VE to assume a person with the functional capacity determined by Dr.

Lower, as follows:

> [A]n individual who is 39 years of age, has the education and past
> relevant work history as described for the claimant.  That the
> individual can . . . occasionally and frequently lift less than 10
> pounds.  She has no limitations on standing, walking or sitting.  Her
> pushing and her pulling are limited in the upper extremities,
> particularly the left . . . upper extremity to only occasionally.  She's
> to never climb, balance, kneel, crouch or crawl.  She has limited
> reaching in all directions, including overhead, handling, fingering
> and feeling.  She is limited in exposure to temperature extremes,
> dust, vibration, humidity and . . . hazardous fumes, odors, chemicals
> and gases.

TR. 208-09.  The VE responded that this person could not perform Kirk's past relevant work and

that this person would be limited to less than the full range of sedentary employment.  TR.  209.

The ALJ then asked the VE to assume the same individual with the following functional capacity:

> [T]he individual could lift 20 pounds occasionally, 10 pounds frequently. . . . [S]he could sit, stand and walk for 6 hours out of an eight hour day.  She has only occasional use of her upper extremities.  She can only occasionally climb, stoop, kneel, crouch, crawl and frequently balance.  She can only occasionally reach in all directions, including overhead.  She's to avoid concentrated exposure to hazardous such as heights . . . .

TR. 209.  The VE responded that this person could not perform Kirk's past relevant work.  TR. 209.  However, the VE stated that this person could perform the jobs of non-emergency dispatcher and telephone sales [6], both of which were available in the local, state and national economy.  TR. 210.  The VE, responding to a follow-up question by the ALJ, testified that limiting the individual's ability to lift to 10 pounds would not change the person's ability to perform the identified jobs.  TR. 210.

Finally, the ALJ asked the VE to assume the following hypothetical claimant:

> Say a hypothetical individual, same age, same past relevant work, 20 pounds occasionally, 10 pounds frequently, sit, stand and walk for six hours in an eight hour day.  She can only occasionally crouch and crawl.  She can only occasionally reach over head in all directions including . . . overhead and she's to avoid concentrated exposure to hazards . . . .

TR. 210.  The VE testified that these limitations did not change her opinion that such a person could perform the identified jobs.  TR. 211.

---

[6] The VE testified that the non-emergency dispatcher job is found in the *Dictionary of Occupational Titles* (DOT) at 239.367-014. It is a sedentary position. The telephone sales job is found in the DOT at 299.257-014.  It is also a sedentary position.  TR. 210.

Kirk's attorney asked the VE to assume that the hypothetical individual had mental cloudiness, which he defined as having trouble with short term memory.  With this added limitation, the VE opined that the person could not perform the job of non-emergency dispatcher or telephone sales.  TR. 213.

C.    *Medical Evidence.*

On June 30, 1998, Silvia R. Triplett, A.R.N.P.,[7] examined Kirk regarding complaints of two years of paresthesia[8] affecting both arms.  TR. 93.  Triplett noted that Kirk was "morbidly obese."  TR. 92.  Triplett's impressions were degenerative disc disease, nerve impingement syndrome, severe arthritis of the spine, cardiomegaly,[9] and paresthesia of both upper extremities. TR. 92.  Triplett recommended that Kirk undergo more tests.  TR. 91.

In July 1998, Kirk was examined by William B. Kuhn, M.D., for complaints of intermittent numbness in her right hand and arm, and muscle spasms in her neck.  Dr. Kuhn's impression was cervical spondylosis and degenerative disc disease with possible cervical radiculopathy.  TR. 127. On October 9, 1998, Charles R. Martin, M.D., interpreted an MRI of Kirk's spine.  TR. 129.  He noted that the MRI revealed no compression injuries, but it did reveal disc protrusion at C6-C7, which indented the thecal sac.[10]  TR. 125, 129.

---

[7] A nurse practitioner, while not a "qualified treating source" for purposes of establishing the existence of an impairment, is a medical expert whose opinion constitutes medical evidence to demonstrate the severity of and limitations caused by impairments.  20 C.F.R. § 404.1513(a) & (d)(1); *Matthews v. Barnhart*, 339 F. Supp. 2d 1286, 1289 n.6 (N.D. Ala. 2004).

[8] Paresthesia refers to "an abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S MEDICAL DICTIONARY 1300 (26th ed. 1995) (hereinafter "Stedman's").

[9] Cardiomelagy refers to an enlargement of the heart.  Stedman's at 281.

[10] The term thecal refers to a tissue sheath, especially the sheath surrounding a tendon.  Stedman's at 1794.

On May 31, 2000, Kirk visited Peter J. Milazzo, Jr., M.D., regarding complaints of right elbow pain, low back pain, and left knee discomfort.  TR. 101.  After examining Kirk, Dr. Milazzo's impressions were rosacea,[11] deconditioning, overweight, and left lateral epicondylitis.[12] TR. 100.  Dr. Milazzo gave her an epicondylar splint and recommended further testing.  TR. 100.

In June 2001, Kirk again visited Dr. Milazzo, complaining of heel pain.  TR. 95.  A left foot X-ray revealed a minimal calcaneal spur.  TR. 96.  Kirk had physical therapy that improved her ability to walk but did not resolve the pain.  TR. 102-04.

On September 17, 2001, Stephane Lavoie, M.D., examined Kirk to investigate her complaints of neck, left shoulder and left arm pain.  TR. 107-08.  Dr. Lavoie noted that Kirk was 5'4" tall and weighed 180 pounds, which Dr. Lavoie described as "slightly overweight."  TR. 107. Upon examination, Dr. Lavoie observed the Kirk had good range of motion with her neck, full strength in her biceps but 4/5 strength in her triceps.  An MRI revealed large disc herniation at C6-7 causing displacement of the spinal cord and exiting nerve root.  Dr. Lavoie's impression was herniated disc of the cervical spine with secondary left radiculopathy.[13]  TR. 107.  Dr. Lavoie continued Kirk's prescription for Celebrex[14] and Percocet and informed Kirk of her treatment options, including surgery.  TR. 107.

---

[11] Rosacea refers to "[c]hronic vascular and follicular dilation involving the nose and contiguous portions of the cheeks[.]"  Stedman's at 1559.

[12] Epicondylitis means inflammation of the vascular area at the rounded end of a bone.  For example, epicondylitis at the elbow joint is commonly known as "tennis elbow."  Stedman's at 582.

[13] Radiculopathy is a disorder of a spinal nerve root.  Stedman's at 1484.

[14] Celebrex is a non-steroidal anti-inflammatory drug.  Drugs.com *at* http://www.drugs.com/celebrex.html (last visited Aug. 31, 2005).

On September 17, 2001, Kirk underwent an epidural injection to treat her pain.  TR. 156-57.  In a follow-up examination, Dr. Lavoie wrote that Kirk had less pain in her arm, but still discomfort, and weakness and numbness in her hand.  TR. 106.

From January 2001 to April 2003, Kirk visited Selma Delima, M.D., for pain treatment. TR. 131-38, 152-55.  Dr. Delima diagnosed Kirk with cervical spondilolysis,[15] degenerative disc disease, radiculopathy, and obesity.[16]  TR. 136-37. On a number of occasions, Dr. Delima prescribed Lortab[17] to take as needed to treat Kirk's pain.  TR. 138, 152.  Dr. Delima also prescribed Oxycontin, Celebrex, and Toradol.[18]  TR. 137, 154.  On February 14, 2002, Dr. Delima noted that Kirk's weight was 203 pounds and that she reported persistent pain.  Dr. Molina diagnosed her with obesity.  TR. 131.  On March 21, 2003, Dr. Delima noted that Kirk complained of migraines three to four times per month, and that Lortab reduced her pain from 9 to 2 on a scale of 1 to 10, where 10 is the most severe pain.  TR. 152, *accord* TR. 155.  Kirk reported no side effects from the medication.  Tr. 152.

A September 11, 2001, MRI of Kirk's spine revealed a large left-sided disc herniation at the C6-7 level, producing a marked compression upon the left central thecal sac and left lateral recess as well as the medial aspect of the left neural foramen.[19]  TR. 134-35.

---

[15] Spondilolysis refers to "[d]egeneration or deficient development of the articulating part of a vertebra." Stedman's at 1656.

[16] A treatment note dated April 2002 reflects that Kirk's weight was 203 pounds.  TR. 131.

[17] Lortab is a narcotic pain relief drug.  Drugs.com *at* http://www.drugs.com/lortab.html (last visited Aug. 31, 2005).

[18] Toradol is a non-steroidal anti-inflammatory drug used to treat pain.  Drugs.com *at* http://www.drugs.com/cons/Toradol.html (last visited Aug. 31, 2005).

[19] A foramen is a "[a]n aperture or perforation through a bone or a membranous structure."  Stedman's at 674.

On April 18, 2002, Jack Pulwers, M.D., examined Kirk at the request of the Florida Office of Disability Determinations.  TR. 139-42.  Dr. Pulwers noted that Kirk's weight was 204 pounds. Upon examination, he observed that Kirk had moderate paraspinal cervical and upper thoracic spasm and tenderness.  TR. 140.  Her grip strength was normal, but she had tenderness in the left upper arm elicited with forced outward rotation.  An x-ray showed disc space narrowing at L4-L5 and L5-S1.  Dr. Pulwers' impressions were cervical spine herniated nucleus pulposus, low back pain with sciatica,[20] rosacea, lumbosacral spondilolysis with degenerative disc disease and degenerative joint disease, and left shoulder rotator cuff syndrome.  TR. 141.

On July 23, 2003, Gregory M. Lower, D.O., completed a social security disability evaluation based on an examination of Kirk and review of her medical records.  TR. 158-79.  Dr. Lower noted that Kirk weighed 190 pounds at the time of the examination.  She complained of both sharp and dull pain that was constant with burning pain radiating into both upper extremities. TR. 160, 168-69.  She rated her pain at the time of examination as a 7 on a scale of 1 to 10, a 3 on her best day, and over a 10 on her worst day.  TR. 174.  She also reported "mental clouding" secondary to her pain medicine.  TR. 158.  Upon examination, Dr. Lower observed moderate cervical and upper thoracic paraspinal muscle spasms, mild lumbar paraspinal muscle spasms with forward bending, and a positive Spurling's sign.[21]  TR. 160-61.  Kirk had difficulty with numbness and performing repetitive motion tasks with her left hand.  TR. 161.  Dr. Lower's clinical

---

[20] Sciatica refers to "[p]ain in the lower back and hip radiating down the back of the thigh into the leg." Stedman's at 1580.

[21] "Spurling's sign refers to the reproduction or exacerbation of pain upon pushing down on the head and bending it toward the involved side."   UCLA, Spinal Diseases & Disorders, *Cervical Disc Disease*, at http://neurosurgery.ucla.edu/Diagnoses/Spinal/SpinalDis_1.html (last visited Aug. 31, 2005).  A positive Spurling's sign is suggestive of cervical disc herniation.  *Id.*

impression was herniated nucleus pulposus of C6/7 with associated left upper extremity C8 radiculopathy. TR. 162. He also diagnosed a reduced range of motion in Kirk's shoulders. TR. 163. Dr. Lower opined that Kirk would be subject to the following exertional limitations: (1) the ability to occasionally and frequently lift and carry, at most, less than 10 pounds and (2) limited pushing or pulling in the upper extremities. TR. 165-66. She would further be limited in her ability to reach in all directions and handle, finger, and feel objects. TR. 167. She should never climb, balance, kneel, crouch or crawl. TR. 166. Kirk would be subject to limitations in the extent to which she could be exposed to temperature extremes, vibration, humidity or wetness, hazards, and fumes, odors, chemicals, and gases. TR. 167.

     D.    *Reviewing Physicians' Opinions.*

On December 6, 2001, Harry L. Collins, Jr., M.D., an orthopedic surgeon, completed a physical RFC assessment regarding Kirk. TR. 114-21. Dr. Collins opined that Kirk would be subject to the following exertional limitations: (1) occasionally lift or carry 20 pounds; (2) frequently lift or carry ten pounds; (3) stand or walk for six hours in an eight-hour workday; (4) sit for six hours in an eight-hour workday; and (5) unlimited pushing and pulling. TR. 115. He further opined that Kirk would frequently be limited in her ability to climb, balance, stoop, and kneel, and occasionally be limited in her ability to crouch and crawl. TR. 116. In addition, Kirk would be limited in her ability to reach in all directions, and she would have to avoid concentrated exposure to hazards such as machinery and heights. TR. 117-18.

On May 3, 2002, Ruben E. Brigety, M.D., an Ob/Gyn specialist, completed a physical RFC assessment of Kirk. TR. 144-51. Dr. Brigety opined that Kirk would have the same exertional

-12-

limitations that Dr. Collins opined she would have, with the exception that her ability to push and pull would occasionally be limited with respect to her upper extremities. TR. 145. Dr. Brigety further opined that Kirk would frequently be limited in her ability to balance, and occasionally be limited in her ability to stoop, kneel, crouch, and crawl. TR. 146. Kirk would also be limited in her ability to reach in all directions. TR. 147. She would also be required to avoid exposure to hazards, such as machinery and heights. TR. 148.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI and OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In a case seeking disability benefits under SSI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the

-13-

findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th

Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as

well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.

1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that

the evidence weighs against the SSA's decision, the court must affirm if the decision is supported

by substantial evidence.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court

may not reweigh the evidence or substitute its own judgment, even if the court finds that the

weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of

the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the

proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir.

1988).

## V.    ANALYSIS.

Kirk argues that the ALJ erred by failing to consider her impairments in combination,

including the effects of obesity; by failing to address the effect of "mental cloudiness" on her

functional capacity; by improperly applying the pain standard when judging her credibility; and by

discounting the opinion of Dr. Lower.  I address only the first issue because I find it to be

dispositive.

-14-

*Combination of Impairments.*

To the extent that Kirk contends that the ALJ did not consider any of her impairments in combination, this argument is not supported by the record.  The ALJ's decision discusses both physical and mental impairments.  In reaching her conclusion about the extent of Kirk's impairments, the ALJ explicitly found that Kirk had "a combination of severe impairments."  TR. 18.

Kirk also contends, however, that the ALJ erred by failing to consider Kirk's obesity in combination with her other impairments.  Social Security Ruling 02-01 instructs that an ALJ should "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity[,]" and sets out a medical explanation of what obesity is and how it can affect a person's ability to perform certain tasks.  *Titles II & XVI: Evaluation of Obesity*, Soc. Sec. R. 02-01p (Sept. 12, 2002).

The ALJ's opinion does not mention Kirk's weight or otherwise specifically acknowledge the many medical findings of obesity in the record.  The Commissioner argues that this oversight is, at most, harmless error because Kirk does not assert how the ALJ's decision would have changed had she considered Kirk's obesity in making her functional capacity assessment.  The law she relies upon does not, however, address the factual situation presented here: that is, when an ALJ fails to acknowledge or address the medical evidence of a claimant's obesity.

One court in this circuit has held that an ALJ's failure to address obesity, among other impairments, was reversible error when several diagnoses of obesity were present in the claimant's

-15-

medical records, despite the fact that the claimant failed to allege that it was one of her impairments when she applied for benefits. *Williams v. Barnhart*, 186 F. Supp. 2d 1192, 1198 (M.D. Ala. 2002). Likewise, another court held that an ALJ, who made no findings regarding a claimant's well-documented obesity, erred by failing to consider the claimant's obesity in combination with her degenerative disc disease. *Brown v. Barnhart*, 325 F. Supp. 2d 1265, 1272-1273 (N.D. Ala. 2004).

Kirk's weight coupled with diagnoses of obesity are well documented in her medical records. I am not unsympathetic to the argument that Kirk did not allege in her disability application or in the Memorandum to the Appeals Counsel, TR. 8-10, that her obesity contributed to her functional impairments, and she does not identify in the memorandum presented to this Court what additional functional limitations the ALJ should have found if obesity had been considered. Nevertheless, it appears that the law in this Circuit requires remand when an ALJ fails to consider properly a claimant's condition despite evidence in the record of the diagnosis. *See Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1219 (11th Cir. 2001) (remand required because ALJ failed to address evidence that claimant suffered from chronic fatigue syndrome). Because obesity may have exacerbated the pain Kirk experienced as a result of her other impairments, particularly degenerative disc disease and degenerative joint disease, I cannot determine with confidence that consideration of her obesity might not have resulted in the ALJ reaching a different conclusion regarding Kirk's RFC. Accordingly, this case is due to be reversed and remanded for further proceedings.

## VI.    CONCLUSION.

For the reasons stated above, the decision of the SSA is **REVERSED** and the case is

**REMANDED** for further proceedings.  It is further **ORDERED** that the Clerk of Court shall issue

a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 1, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties